**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CASE NO.3:11CR30038MAP |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| DONNIE RUSHING, JR., ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT'S SENTENCING MEMORANDUM AND**
**REQUEST FOR BELOW GUIDELINE SENTENCE**

INTRODUCTION

Donnie Rushing, Jr. is a 36 year old man who, like many of the defendants that pass before this Court for sentencing, never knew his father.  However, unlike many of these same defendants, Mr. Rushing's mother was a serious heroin addict at the time of his birth. Even more unique, Mr. Rushing's mother taught her son how to steal from a very early age. If one wants to understand what set Mr. Rushing on his path to sentencing in this Court, one need look no further than the life he was born into and the lack of any beneficial influences which might have led him to lead a more productive and fulfilling life.

Donnie Rushing, Jr. respectfully requests that this Honorable Court impose a below guideline sentence of 12 months confinement with respect to the charges of 1) possession with intent to distribute  marijuana; and 2)  and felon in possession of a firearm. On the charge of possession of a firearm in furtherance of a drug trafficking crime, the defendant requests that this Court impose the mandatory 60 month sentence on and after the sentence imposed on counts one

through two.  Mr. Rushing also requests that this Court impose a four year period of supervised release.

## THE OFFENSE

On October 8, 2011, Springfield Police officers Devon Williams and Greg Caputo stopped a car that Mr. Rushing was driving at the intersection of Wilbraham Road and Wilbraham Avenue in Springfield, Massachusetts. Mr. Rushing informed the police officers that he did not have a driver's license. The officers smelled marijuana in the car. Mr. Rushing was ordered out of the car and then the officers performed a search of the vehicle. The officers found a handgun, ammunition and a nylon bag which contained an amount of marijuana.[1]

## POTENTIAL PENALTIES

There are no minimum mandatory sentences for counts one and two. On count three, there is a minimum mandatory sentence of five years to be served on and after any sentence imposed on counts one through three. The maximum penalty on court three is life. On counts one and two, the guideline range is 46 to 57 months. On count three, the minimum mandatory sentence is 60 months, to be served on and after any sentence(s) imposed on the first two counts.

## DONNIE RUSHING, JR.'S ROAD TO THIS SENTENCE

Donnie Rushing, Jr. is the youngest of four children born to Christine Bryant and the only child from her relationship with Donnie Rushing, Jr. Mr. Rushing never met his father. His mother was a heroin addict who frequently forced Mr. Rushing's older sister, Gloria Plummer, to

---

[1] It is noted in paragraph 8 of the PSR that the state lab analysis revealed that there were 276.86 grams of marijuana found in the nylon bag. Mr. Rushing has objected to that amount as the police report in the case as well as testimony from Officer Williams indicate that the bag contained three ounces of marijuana. The defendant notes that the difference in weight does not affect the guidelines computation in this case based upon the calculations set forth in paragraphs 13-31 of the PSR.

care for young Donnie when his mother was not around or available to the family, which, according to Gloria was frequent. According to Donnie's sister, she was totally responsible for raising her younger brother until she left the home. The only time she got a break from the responsibilities of raising her brother was when she went to school. Unfortunately for both Mr. Rushing and his sister, he was raised by a child. When Mr. Rushing was six, his mother was sentenced to jail for two consecutive six month sentences. He and his family members were moved around from place to place. Life was made even more difficult at that time as some living quarters were poor places for a child to be raised in. At times the family had no food.

At age seven, Mr. Rushing began to experience physical and sexual abuse at the hands of his older brother Tyrone. As far as Mr. Rushing remembers, the abuse lasted for a couple of years. Although the abuse stopped, Tyrone continually attempted to abuse Donnie. Even though he was unable to commit more abuse, Mr. Rushing's older brother was constantly lurking around and asking if Mr. Rushing had told anyone about the abuse and threatening him if he did tell anyone.

It appears that the only guidance Donnie received from his mother was how to steal and shoplift. When he was 10 years old, his mother made him steal from Lechmere. (PSR-p.19, ¶ 56)[2]

At age 10, Mr. Rushing and his mother went to live with his uncle. It was during this time that Mr. Rushing's mother died of AIDS as a result of her drug abuse. Donnie was too young to understand what had happened to his mother. He remembers her lying on the couch and his uncle then taking her to the hospital. He never saw her again.

---

[2] Reference to the Presentence Report, page and paragraph.

After his mother's death, Mr. Rushing's uncle, Richard Freeman raised him. For the first time in his life, Mr. Rushing was given some financial and emotional security. This new found comfort was not to last long as Mr. Freeman soon died and Mr. Rushing was again deprived of any guidance or direction. He stopped going to school in the eighth grade. He did attend the Massachusetts Career Development Institute at the behest of his sister to enable him to learn a trade. He dropped out during the 10th grade. He has yet to obtain a high school diploma or GED. Since dropping out of school Mr. Rushing has held a few under the table jobs and jobs he worked while on pre-release through the Massachusetts Department of Corrections. Mr. Rushing cannot be faulted for lack of trying to obtain employment. According to Evelyn Cotto, the mother of one of his children, he would continually apply for jobs but no one hired him. This left Mr. Rushing both discouraged and depressed about his prospects for obtaining full time work. According to Mr. Rushing, when he was released on parole he went to live with Ms. Cotto. Ms. Cotto encouraged him to find a job and start paying for himself to stay with her. He applied for a number of jobs and attended some job interviews but he was never hired. He was not able to pay for things He felt as if he were a burden on those who let him live with them. He resisted the opportunity to resolve his financial problems by selling drugs. But eventually the financial pressure was too great for him to resist and he agreed to sell marijuana for a friend. That same friend provided the handgun that was found in the car Mr. Rushing was driving.

### MENTAL & EMOTIONAL CONDITIONS AS A BASIS FOR A DOWNWARD DEPARTURE FROM SENTENCING GUIDELINES

Mr. Rushing contends that a downward departure is warranted in this case due to mental and emotional conditions. Pursuant to U.S.S.G. Sec. 5H1.2 mental and emotional conditions are relevant in determining whether departure is warranted.

An evaluation performed at the Hampden County House of Correction in January, 2012 led to a diagnosis of Posttraumatic Stress Disorder (PTSD) and Depressive Disorder, Recurrent. (PSR-p.25, ¶82). In February, 2012, Earl Mauricio, M.D. diagnosed Mr. Rushing with mood disorder, PTSD and Polysubstance Abuse. (PSR-p.26, ¶83). In April, 2012, while incarcerated at MCI Cedar Junction, Mr. Rushing reported increased depression and flashbacks.

Although there is nothing in the clinical data which would suggest that Mr. Rushing's offense related behaviors were the direct result of his psychiatric symptoms or his cognitive limits, it is important to note that, as Dr. Lester describes in his report of September 19, 2013, "his life story portrays a certain inevitability when one considers his participation in offenses such as the ones being addressed here."

Mr. Rushing's childhood was marked by a fragile and disorganized family structure, an extended period of physical and sexual abuse and poverty. He was ill-prepared to face the challenge of adapting to adult life due to a lack of support and positive role models as a child. He was also poorly equipped to deal with the demands of adult life based upon his cognitive deficits. An IQ test administered to Mr. Rushing placed him in the Extremely Low or Mild Mental Retardation range of intellectual functioning. According to Dr. Lester his very low score reflects learning deficits which are especially prevalent when he tries to focus on ideas.

As Dr. Lester indicates, Mr. Rushing has been diagnosed with Dysthymic Disorder. He has also experienced bouts of Major Depression and clearly suffers from posttraumatic stress dating back to his childhood victimization.

### DRUG DEPENDENCE AS A BASIS FOR A DOWNWARD DEPARTURE FROM SENTENCING GUIDELINES

Mr. Rushing contends that a downward departure is warranted in this case due to his dependence upon marijuana. Pursuant to U.S.S.G. Sec. 5H1.4, a defendant's physical condition,

including drug or alcohol dependence, is relevant in determining whether departure is warranted.

Mr. Rushing began smoking marijuana at age 16. When he was 21 he was smoking four "blunts" per day. By the time he was 23, Mr. Rushing was using one-half ounce of marijuana daily. He would often exceed the one-half ounce mark when smoking with others. This amount of usage continued up until his arrest in October, 2008. Mr. Rushing's alcohol use began at age 17. His alcohol use peaked to the point where he was drinking a fifth of cognac and a six pack of beer three to four times per week. At the time of his arrest, Mr. Rushing admits that he was under the influence.

## THE COURT SHOULD IMPOSE A BELOW GUIDELINE SENTENCE BASED UPON THE FACTORS ENUMERATED IN 18 U.S.C. § 3553(a)(1)

As stated by the Supreme Court and as this Court well knows, the Sentencing Guidelines are no longer binding on the Court. United States v. Booker, 125 S.Ct. 738 (2005). Instead, under 18 U.S.C. § 3553(a), the Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in Section 3553(a)(2). If the Court is not inclined to depart downward on the basis of Mr. Rushing's mental and emotional condition as well as his drug dependency, he contends that the Court should consider both his traumatic upbringing in terms of his drug dependent mother and his abusive older brother as well as the complete lack of guidance received as a youth in crafting a sentence which is sufficient but not greater than necessary to achieve the proper goals of sentencing.

The Sentencing Reform Act has always provided that the "court, in determining the particular sentence to be imposed, shall consider-- (1) the nature and circumstances of the offense *and the history and characteristics of the defendant*," 18 U.S.C. § 3553(a)(1) (emphasis supplied), and that "[n]o limitation shall be placed on the

information concerning the *background, character*, and conduct of [the defendant which the court] may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661 (emphasis supplied). However, other than the aggravating factor of criminal history, the mandatory guidelines and interpretive case law prohibited, discouraged or hedged with limitations and exceptions the defendant's mitigating history and characteristics.

Mitigating factors that were previously discouraged except under certain circumstances or for certain purposes should be considered more broadly to the extent they bear on the sentencing considerations found in section 3553(a). Those are age, education and vocational skills, mental and emotional conditions not meeting the diminished capacity standard, physical condition or appearance, employment record, family ties and responsibilities, military, civic, charitable or public service. See U.S.S.G. §§ 5H1.1-6, 11.

Post-Booker cases illustrate that the court may consider formerly discouraged factors, or facts that would not have met pre-Booker standards for departure, to impose a lower sentence. See, e.g., United States v. Spigner, 416 F.3d 708, 711-13 & n.1 (8th Cir. 2005) (health problems); United States v. Gorsuch, 404 F.3d 543 (1st Cir. 2005) ("serious mental illness, maternal responsibilities, and lack of a criminal record may be more relevant than under the pre-Booker regime of mandatory guidelines"); United States v. Antonakopoulos, 399 F.3d 68 (1st Cir. 2005) (that defendant was caretaker for brain damaged son may be considered under 3553(a) though there were alternative means of care and thus not ground for departure); United States v. Haidley, 400 F.3d 642, 645 (8th Cir. Mar. 16, 2005) (that defendant used embezzled money for her child's high medical

7

expenses, and her "family situation, which included two young children at home" (neither of which rose to the level of departure) were both "factors which can be considered under 3553(a)(1) ('the nature and circumstances of the offense and the history and characteristics of the defendant').").

The Court should also consider a child's upbringing and total lack of guidance as having a significant impact upon his criminal behavior. As described above, Mr. Rushing's childhood was marked by a fragile and disorganized family structure with an extended period of physical abuse and sexual victimization. To make matters worse, his childhood was marked by significant periods of poverty where he was abandoned by his drug addicted mother and raised by an older sister who herself was a child. In addition, at an early age, Mr. Rushing was introduced to the ways of a criminal lifestyle. But this introduction was not through a peer or a friend but through his own mother, the one person that society demands of providing a nurturing environment. Although his mother died when he was a young boy, Mr. Rushing's life was subject to a vacuum which no one filled to provide the type of support which would enable him to navigate the sometimes difficult waters of adulthood.  As described by Dr. Lester:

> with no source of positive self-esteem, the central roles depression and substance abuse played in his life have been inevitable . . . [T]he chronic recidivism, unemployment, and poverty of this man's adult life are the product of his emotional, cognitive, social support and economic deficits.

Mr. Rushing is recommending a six year prison sentence for these crimes. Five years would be served as a minimum mandatory sentence. He has previously served a sentence of six to eight years in the state system. (PSR-p.16, ¶50).   However, once he completed that sentence, he was again navigating troubled waters on his own without any type of counseling to assist him

in decision making as well as to support him through life crises. In this case, Mr. Rushing will receive a sentence which will also include a period of supervised release. It is unlikely that Mr. Rushing will receive the counseling he so desperately needs while in the custody of the Bureau of Prisons.  A report from the Bureau of Justice Statistics from 2006 says that only 15.1% of inmates who had a mental health problem received professional mental health therapy after admission to the Bureau of Prisons.[3]

The period of supervised release will be the most crucial part of this sentence. As Dr. Lester indicates, what Mr. Rushing needs is "*ongoing, coordinated, supportive interventions*" which would "focus on the development of emotional coping, community readjustment and (realistic) vocational skills." There is hope that this approach will be successful for Mr. Rushing. While in custody to the Massachusetts Department of Corrections, Mr. Rushing was able to maintain employment as both a forklift operator and as a restaurant worker. (PSR-p.28, ¶¶95 & 96).

## CONCLUSION

Mr. Rushing has accepted responsibility for his actions by pleading guilty to these three crimes. His upbringing, lack of guidance received as a youth and his drug dependence are factors that require a six year sentence which is a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in Section 3553(a)(2).

---

[3] Doris James and Lauren Glaze, "Mental Health Problems of Prison and Jail Inmates," Office of Justice Programs, Bureau of Justice Statistics, September 2006, Table 14, p. 9.

Respectfully submitted,

DONNIE RUSHING, JR.

/s/ *William J. O'Neil*
WILLIAM J. O'NEIL
Attorney for the Defendant
7 Stockbridge Street
Springfield, MA 01103
(413) 733-6821
BBO#:548445

CERTIFICATE OF SERVICE

William J. O'Neil, hereby certifies that this document, filed through the ECF System will be sent electronically to all parties involved on this 26th day of September, 2013.

/s/ *William J. O'Neil*
WILLIAM J. O'NEIL